

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-17-00083-CV

IN THE INTEREST OF E.M., E.M., J.L., A.L., AND M.L., CHILDREN

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 16C1580-102

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

The Texas Department of Family and Protective Services (the Department) filed a petition to terminate Jason Lester's parental rights to his four children, Emily, Alice, Jane, and Mary.[1] The trial court terminated Lester's parental rights after finding that (1) he voluntarily left the children alone or in the possession of a non-parent for at least three months without providing adequate support for them or expressing an intent to return, (2) he knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, (3) he engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and (4) termination of his parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(B), (D), (E), (b)(2) (West Supp. 2017).

On appeal, Lester argues that the evidence is legally and factually insufficient to support the trial court's findings on the statutory grounds for terminating his parental rights.[2] Because we find that sufficient evidence supported the trial court's finding under Ground D, we affirm the trial court's judgment.

---

[1]To protect the confidentiality of the children involved, this Court will refer to all involved parties by fictitious names. *See* TEX. R. APP. P. 9.8(b).

[2]Lester does not challenge the best-interest finding.

**I.     Sufficient Evidence Supports Termination of Lester's Parental Rights**

**A.     Standard of Review**

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).  We construe involuntary termination statutes strictly in favor of the parent. *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (citing *Holick*, 685 S.W.2d at 20).

In order to terminate parental rights, the trier of fact must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest.  TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012).  "Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).  This standard of proof necessarily affects our review of the evidence.

Despite the heightened burden of proof that is required to be met, in our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds

3

for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the trial court resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine "whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. In our deliberations, we make "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)). Nevertheless, we maintain our deference for the role of the fact-finder. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). The fact-finder is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony. *H.R.M.*, 209 S.W.3d at 109.

Although profound constitutional interests are at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re*

4

*A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994) (citation omitted)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

### B. The Evidence at Trial

Lester testified that he divorced the children's mother in 2014 as a result of her drug use. After her incarceration in 2016, Lester, who was unemployed and had no home of his own, was left to care for the children alone. Lester chose to live at the residence of his girlfriend, Jennifer Jeffrey, with the children, even though he knew that Jeffrey was abusing drugs at that time. When Lester discovered that Jeffrey "had left some marks on [the] kids' butts," he broke up with Jeffrey and moved into his sister's home for one month with the children. They soon needed another place to live.

On July 7, 2016, Lester took the children to the home of their elderly maternal great-grandparents, Chris and Kathryn Telard. Lester knew that Kathryn was legally blind, that Chris used a cane to walk, and that the couple was generally in poor health. Lester also had knowledge that the children had gotten lice while they had previously stayed at the Telards' home in 2014. Lester admitted that the condition of the Telards' home was dirty, but that he and other family members had assisted in cleaning up the house.

The evidence at trial established that Lester had asked Chris if he could stay with the children, but that Chris would not allow Lester to move in because he was concerned that he would be unable to force Lester to remove himself from the house later. Consequently, Lester left the

5

children with the Telards and moved to Hope, Arkansas, as he attempted to secure an apartment for them. Lester's mother, Lisa Bailey, and step-father, Charles Bailey, maintained a home approximately one-half mile from that of the Telards. Lester testified that he travelled to the Bailey home on the weekends to visit with the children there.

Tanya Delamar, an investigator with the Child Protective Services (CPS) Division of the Department, testified that she received an intake in September 2016, the Telards were physically unable to care for the children, the condition of the home was concerning, and the children were not attending school regularly or receiving proper medical care. Delamar, who traveled to the Telard home to investigate the initial complaint, testified that the Telards were "in bad health" and the home was "not really clean." Although she did not see anything "particularly dangerous" about the condition of the home, she spoke to the Telards, who informed her that they had been unable to "get Mr. [Lester] to come and get the children."

Delamar discovered that the children were attending school, but that Alice had missed one day of school and the other children had missed "several days" by the September intake. Delamar testified that eight-year-old Jane was in good physical condition and was able to care for herself, that eleven-year-old Emily was the caregiver to six-year-old Mary, and that Mary was "a little dirty," but that it was late in the afternoon. She added that the children's physical needs had been met, but was concerned that nine-year-old Alice, who had her trachea removed, still had a gastronomy tube and a stoma site which had not healed. Alice had also undergone foot surgery to repair a foot that "turn[ed] out" and surgery for a "misaligned" jaw. Delamar opined that Alice may not have been receiving adequate medical treatment, but failed to request any medical records

6

to ascertain whether medical treatment was required. However, she testified that Lester had made several appointments for Alice for follow-up treatment, but had not kept those appointments. According to Delamar, Alice's medical condition was not life-threatening, but the lack of medical treatment affected her quality of life.

Following this initial investigation, Delamar testified that she received an additional report that "bug droppings" were seen in milk that had been sent to the school for Alice. When Delamar returned to the Telard home to investigate the new report, she discovered a dead rodent atop a plastic tub containing milk and other supplies for Alice, as well as insect droppings inside of the tub. Delamar clarified that the Telards could not see the droppings and were simply unaware that the home needed to be cleaned. Delamar's investigation concluded with a finding that the Telards were not physically able to care for the children and that the conditions of the home endangered the children's physical health.

Delamar testified that she spoke with Lester in October 2016, explained that the Telards were unable to care for the children, and asked Lester to either take the children or secure another placement for them. In response, Lester informed Delamar that he anticipated having an apartment by November 1. However, Delamar advised that she later spoke with Lester, who again claimed he was unable to secure an apartment, and that the repetitious nature of the conversation prompted the Department to take action. At trial, Lester testified that his ex-girlfriend had stolen his bank card and that it took a few months to get the money back from the bank. He claimed that he already had a mobile home secured for use as a residence and had gotten the electricity turned on by December 1. However, by this time, the children had missed more school, and Lester testified it

did not surprise him that Emily and Jane had missed eighteen days of school between September 8 and November 28. Lester was also not surprised to learn that all of the children also had lice when they came into the Department's care because he had treated the children for head lice "[s]everal times."[3]

Delamar also testified that the Telards reported receiving no support from Lester other than the milk he dropped off for Alice. Delamar added, however, that Lester claimed to her that "he was providing like 15 cans of food every month because he was still receiving the SNAP benefits, and he was still receiving [Alice's] [Social Security Income (SSI)] disability check." At trial, Lester admitted that he used Alice's SSI check, which was $733.00 per month, but testified that he used it to buy groceries and clothes for all of the children while they were at the Telards. The Baileys testified that they personally witnessed Lester purchasing groceries for the children every month.

According to Delamar, Lester made no effort to obtain the children's return before they were removed from the Telard home on December 8, 2016. In January, Lester moved into the Bailey home and was provided with a family service plan which outlined services and requirements for Lester to complete prior to obtaining the return of his children. In February, Lester was arrested on an outstanding warrant for driving an automobile while his driver's license was invalid, served sixty days in county jail, and was released in April. Chandra Zachery, a caseworker with CPS, testified that Lester did not work on the family service plan from January

---

[3]The testimony established that Delamar "saw the lice at the girls' shelter the night that [she] placed [Emily, Jane, and Mary]," but did not become aware that Alice had lice until Alice's foster parent called on the day after her placement. However, Delamar testified she could not be certain where the children had contracted the lice.

to May 2017.  In June, the month before the final termination hearing, Zachery testified that Lester began counseling.  While Lester claimed at trial that he had seen the children regularly since he had dropped them off at the Telards in June 2016, he told his counselor in June 2017 that he had not seen the children in about a year.[4]  Although Lester tested negative for drugs on one occasion, Zachery testified that Lester had not taken other requested drug tests.

At trial, Delamar testified that Jane threatened to commit suicide before the children were removed from the Telards' home.  According to Delamar, Emily said Lester did drugs, had beaten the children, and had a girlfriend who had also beaten them.  Delamar and Zachery both testified that after the removal, the children specifically informed them that they did not want to return to Lester or have any contact with him.  Zachery added that the children threatened to run away if they were ever returned to Lester, who they described as "mean."  Melinda Cree, a Court Appointed Special Advocate for the children, testified that the children were afraid of Lester.

Lester admitted that he had smoked marihuana five years ago, but denied any other drug use or physical abuse of the children.  He further denied that he had neglected Alice's medical care, although he admitted that he had to reschedule appointments for her.  Lester testified that doctors informed him that her stoma site would take up to two years to close and that he was to bring her in for a follow-up if it did not close on its own.  Lester said that he had set up a follow-up appointment January 5, 2017, but that the children had already been removed from his care at that time.  Charles testified that he had taken Lester and Alice to medical appointments.

---

[4]Lisa testified that the children came for regular visits to her home.  However, Charles testified that Lester saw the children on Thanksgiving 2016, but did not know if he had visited with them at any other time.

Lester and the Baileys testified that Lester loved his children and yearned for their return. According to Lester, Chris claimed that the children were going to school and that he was not aware that the Telards' home endangered the children. Charles also testified that Lester was led to believe that the Telards were providing a safe place for the children. In terms of planning for the children's return, the Baileys had provided Lester with a three-bedroom home, which he was in the process of repairing. Although he had not worked in three years and had no income, Lester testified he was in the process of appealing the denial of his application for Social Security disability status and the payments that would result from that.

Ultimately, the trial court agreed with Zachery's and Delamar's testimony that Lester had knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being.

### C.      Sufficient Evidence Supported a Ground D Finding Against Lester

Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769 (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.)).

Under Ground D, the trial court may terminate a person's parental rights if it finds that the parent "knowingly placed or knowingly allowed the child[ren] to remain in conditions or

surroundings which endanger[ed] the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). In making that determination, "we must examine the time before the [child]'s removal to determine whether the environment [of the home] posed a danger to the child's physical or emotional well-being." *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.— Houston [14th Dist.] 2005, no pet.). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *L.E.S.*, 471 S.W.3d at 925 (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)).

The child does not have to suffer actual injury. "Rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury." *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.— Tyler 2003, no pet.) (citing *In re J.J.*, 911 S.W.2d 437, 440 (Tex. App.—Texarkana 1995, writ denied)). Moreover, parental rights may be terminated based on a single act or omission by the parent. *L.E.S.*, 471 S.W.3d at 925 (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)).

Here, after their mother's incarceration, Lester moved the children into Jeffrey's home, even though he was aware that she was using illicit drugs. Lester denied having abused the children, but other evidence at trial indicated that Lester was a drug abuser and that the children were beaten by both Lester and Jeffrey. "[A]busive or violent conduct by a parent or other resident

11

of a child's home can produce an environment that endangers the physical or emotional well-being of a child." *Id.* (quoting *In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at *5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem.op.)). The evidence established that all of the children described Lester as mean, desired no contact with him, and threatened to run away if they were ever returned to him and that each was aware that Jane had attempted suicide.

As for the Telards' home, the evidence demonstrated that Lester knew that the elderly couple was in poor health, that their home was unclean, and that the children had previously contracted lice from the home. Lester testified that he and other family members cleaned their home "[s]everal times," demonstrating that he was aware of both the conditions of the home and the Telards' inability to remedy those conditions. Delamar's testimony established that the older children were either caring for themselves or providing care for the younger children. In October, even after Delamar contacted Lester to explain that the Telards were not in a position to physically care for the children, Lester continued to allow his children, including Alice, who had special medical needs, to remain there.

Because the Telards were not able to properly supervise the children, they missed several days of school.[5] Delamar then received a report from the school that Alice's milk contained insect feces. Delamar found a dead rodent atop a plastic container housing Alice's milk and other supplies, and insect droppings inside the container. Delamar testified that Lester "had at that point dropped off a new supply of milk from the provider, but it was out in the garage." Lester testified

---

[5]"Allowing children to live in unsanitary conditions, neglecting their physical condition, and failing to see to their educational needs can constitute endangerment." *In re K.H.*, No. 05-00-02112-CV, 2002 WL 312494, at *3 (Tex. App.—Dallas Feb. 28, 2002, no pet.) (not designated for publication).

that Alice's milk was shipped to him once a month and that he dropped the milk and other groceries off at the Telards, again giving him an opportunity to view the conditions of the home (a home which Delamar testified endangered the children's physical health). When Delamar spoke to Lester in November, he again claimed that a home was not ready for the children and that he allowed them to remain with the Telards. Lester further testified that it did not surprise him that all the children had lice when taken into the Department's care because they had previously become afflicted with head lice at the Telards' home.

Based on the evidence presented, a fact-finder could have concluded that the environment of Jeffrey's and the Telards' homes created a potential for danger to the children's physical and emotional well-being that Lester was aware of, but disregarded. Accordingly, we find the evidence both legally and factually sufficient to support the trial court's finding under Ground D. We overrule Lester's point of error.

## II. Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:     November 20, 2017
Date Decided:       November 21, 2017


13